

# NUMBER 13-25-00005-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

TEXAS MONTHLY, LLC
AND STEVEN MONACELLI,                                                    Appellants,

v.

MICHELLE HAAS,                                                                   Appellee.

### ON APPEAL FROM THE 319TH DISTRICT COURT
### OF NUECES COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca
Memorandum Opinion by Justice Fonseca**

Appellee Michelle Haas sued appellants Texas Monthly, LLC and Steven Monacelli, alleging she was defamed by an article appearing in the December 7, 2023 print edition of *Texas Monthly* and on the publication's website. Appellants moved to dismiss under the Texas Citizens Participation Act (TCPA), and the motion was denied

by operation of law. By a single issue in this appeal, appellants argue the motion should have been granted. Because we agree, we reverse and remand.

## I. BACKGROUND

The article at issue was authored by Monacelli, a freelance investigative journalist, and is entitled "The Texas Historical Commission Removed Books on Racism and Slavery From Plantation Gift Shops." The subhead reads: "An agency spokesperson claimed that the move had nothing to do with politics. Internal emails show otherwise." As of the date of publication, the text of the article was as follows, in its entirety:

> After visiting the Varner-Hogg plantation an hour south of Houston, amateur historian Michelle Haas was incensed by what she had seen. At an exhibit that details the farm's use as a sugar plantation worked by at least 66 slaves in the early nineteenth century, she'd watched an informational video. To her mind, it focused too much on slavery at the site and not enough on the Hogg family, which had turned its former home into a museum celebrating Texas history. She'd also seen books in the visitor center gift shop written by Carol Anderson and Ibram X. Kendi, two Black academic historians who have been outspoken on the issue of systemic racism. Outraged, she emailed David Gravelle, a board member of the Texas Historical Commission [THC], the agency that oversees historical sites at the direction of leaders appointed by Governor Greg Abbott. "What a s—show is this video," Haas wrote on September 2, 2022. "Add to that the fact that the activist staff member doing the buying for the gift shop thinks Ibram X. Kendi and *White Rage* have a place at a historic site."
>
> Over the next eight months, Haas continued to email Gravelle, advocating for such books to be removed. In turn, Gravelle, a marketing executive based in Dallas, took up the cause internally at [THC], calling on agency staff to do away with the titles Haas didn't think belonged at the gift shops. By November of this year, it appeared Haas's demands were met. [THC] no longer sells *White Rage* by Anderson or *Stamped From the Beginning* by Kendi, or 23 other works to which Haas later objected, at two former slave plantations in Brazoria County, including Varner-Hogg. Among the literature no longer available for purchase is an autobiography of a slave girl, a book of Texas slave narratives, the celebrated novel *Roots* by Alex Haley, and the National Book Award-winning *Invisible Man* by Ralph Ellison.
>
> [THC] did not provide *Texas Monthly* with a list of titles no longer for sale. Chris Florance, a spokesperson for the agency, said many books were removed from the historical sites as part of an effort that he said was

2

launched in March to reduce inventory as the agency transitions to a new point-of-sale software system. Emails acquired by *Texas Monthly* through an open-records request reveal, however, that Gravelle was concerned about the way those books presented Texas history and about potential attention from state lawmakers over what books were available for purchase. The emails also show that he had raised those concerns in February, before the agency decided to change its software system.

Haas, a graphic designer from Corpus Christi who sells Texas-themed merchandise, has spent years critiquing historical narratives about slavery. In 2006, she cofounded Copano Bay Press, an independent publishing house specializing in firsthand accounts of Texas history. She wrote and published *200 Years a Fraud*, a full annotation of Solomon Northup's 1853 memoir *Twelve Years a Slave*, which was made into an Oscar-winning film in 2013. In her book, Haas disputes Northup's account of his life and argues that many U.S. histories are overly harsh to the South and do not acknowledge that slavery was "a socially acceptable and economically worthwhile practice worldwide at the time our thirteen colonies arose."

In 2022, Haas launched the Texas History Trust, a nonprofit advocacy organization that aims to fight back against what it describes as "historical societies, university history departments and authors who warp Texas history based on feelings, not the historical record." She has protested the inclusion of so-called "woke ideology," "neo-Marxist" influence, and critical race theory in Texas schools, even though CRT—a framework for examining systemic racism, for example in lending patterns— is not taught below the college level in the Lone Star State.

Haas says that Gravelle, who declined multiple requests from *Texas Monthly* for an interview, was familiar with her before her September 2022 email about the Varner-Hogg plantation. According to Haas, Gravelle is listed on the Texas History Trust's mailing list and has purchased books from Copano Bay Press. She felt confident that he would be an ally in her effort to get books she doesn't like removed from the plantation site. "We don't go yachting together or anything," Haas said. "[But] he's someone who's friendly to us."

Internal [THC] emails reveal her assumption was correct. In the first week of February, a few months after Haas reached out, Gravelle emailed three of the commission's board members, including the chairman, and two high-ranking staff members, citing concerns "about some of the books (and perhaps other items) and the interpretation at our sites that are not about accurate Texas history, but seem to wander off into present social issues." Gravelle wrote that he was inquiring because he'd seen a video that questioned the sale of certain books at historical sites, an apparent reference to a recording produced by Haas and posted on the Texas History

3

Trust's YouTube channel in December 2022. Gravelle made clear in emails that he feared reprisal from the Legislature based on which books were for sale. "I believe we need to take immediate steps to learn the extent of this problem and articulate a remedy, including the source of how this material was approved," Gravelle wrote in the February email. "There is a good chance it will end up in the open forum of the Lege," he wrote, adding that he was concerned about "the inevitable press that would be generated due [to] the emotional nature of this national argument if we do not address it quickly. And I mean quickly."

Matters were not resolved speedily enough for Haas, however. In mid-April, she emailed John Nau III, the chairman of [THC], as well as multiple staff members, and forwarded the email to Gravelle. Haas reiterated her concerns about the informational video she'd seen at the Varner-Hogg plantation, and included a list of 23 books she flagged that were available at the nearby Levi Jordan historical plantation. "I attach a list of the books available with the publisher's description of each," Haas wrote. "You may assess for yourselves how relevant they are to the history of Brazoria County." Most of the 23 books Haas listed were written by Black authors. Haas also criticized the Varner-Hogg museum for not focusing enough on slaves who had perpetrated violence against each other at the behest of their slavers. "Several of the static exhibits at Varner detail the torture inflicted upon the enslaved people who labored there but omit the fact that the chief torturer was one of the slaves," Haas wrote.

On May 3, Gravelle forwarded the list of books to the board member who leads the historic sites committee, John Crain, president and CEO of the Summerlee Foundation, an animal-welfare nonprofit, in Dallas. Gravelle wrote that "there is no question these books are not about Texas history." That description wasn't accurate: one of the 23 titles on the list, for example, was "Remembering the Days of Sorrow," which features testimony from numerous Texan slaves.

Gravelle then sought to craft a seemingly neutral policy to remove the specific books to which Haas objected. "Honestly, it is not hard to fix," Gravelle wrote to Crain. "Create a policy which focuses on [how] the only books/gifts subjects that can be placed in a site should be about Texas history. Put the non-historical books in a box and remove them. Waiting on the bureaucracy to move isn't good enough. The visitor who visits a gift store today will get an impression from the books. Is it the one we want them to have?" Gravelle concluded, "As Committee Chair, maybe you can help."

Crain, an Abbott campaign donor who was appointed by the governor to the commission, did not respond directly to Gravelle via email. But he noted in an email related to *Texas Monthly*'s record request that typically he handles inquiries such as Gravelle's in person. "As a general practice, I bring these issue[s] to the Chairman. Normally, this is shared

4

informally at meetings." Nau, the chairman, is also a two-term Abbott appointee who has donated more than $1.8 million to Abbott's campaigns since 2015. Neither Crain nor Nau responded to multiple requests for interviews.

Gravelle also shared his concerns about books with commissioner Donna Bahorich, a former State Board of Education member and former campaign manager for Lieutenant Governor Dan Patrick. Bahorich also declined multiple requests from *Texas Monthly* for an interview. By the end of May, Gravelle's recommendation to remove books became a policy. The commission staff created an inventory reduction plan, outlining proposals to halt all purchasing for [THC] stores, sell merchandise at a markdown, and identify stock for removal. The deputy executive director of historic sites, Joseph Bell, sent an email to Gravelle confirming that "non-Texas-history books" had been removed as part of a broader inventory reduction effort, per Gravelle's request.

According to an internal [THC] spreadsheet, the two plantation sites had 87 titles available for sale as of June 12. As of November 22, that number had dropped to 39, and all 23 works on Haas's list, as well as *White Rage* and one Kendi book, *Stamped From the Beginning*, were no longer available for purchase at either plantation site. Whether the books were removed and donated, destroyed, or simply sold and never restocked, is unclear. Florance did not respond to questions about what titles were removed and what became of them.

Haas took credit for the removal of the books in an email to supporters of the Texas History Trust. "Hey . . . remember those politically charged books being sold to the public at state-run history sites?" Haas wrote. "Those are gone now. We worked hard to make that happen." In an interview with *Texas Monthly*, however, she couldn't name the exact titles that had been removed from the sites. The video at the Varner-Hogg plantation that she criticized can still be viewed at the visitor center, at least for now.

When asked if it was her intention that historical books about slavery be removed from sites, Haas demurred. "There's always the possibility of overreach or scorched earth," Haas said. "What I wouldn't want is for someone to say, 'let's just print that list out and take it over there and go pull those books.' What I wanted was for them to evaluate each of these titles on their merit for inclusion at state-run history sites."

That culturally significant books about slavery were apparently made casualties of the culture war deeply concerns historians such as Michael Phillips, who is writing a book on eugenics in Texas, was recently a senior fellow at Southern Methodist University, and who filed an initial records request regarding the commission's efforts to remove the works from gift

5

shops. "We have an appalling situation," Phillips said. "The idea that these books are irrelevant somehow is really striking." He added, "to eliminate books about racism at slave plantation sites is like doing an Auschwitz tour and never mentioning antisemitism."

Out of the 39 books currently available across the two Brazoria County plantation sites, only a handful focus on issues of racism and white supremacy. Visitors won't find *Roots*, but they can buy several books that one would not expect to see, following Gravelle's policy of excluding "non-Texas-history books." They include a guide to birds in the state, a book of wildlife photo portraits, and a southern cookbook.

Subsequently, the article was updated, as detailed in the following notes which were appended to the online version of the article:

**Correction, December 12, 2023:** A prior version of this story reported Michelle Haas emailed a list of books that she objected to that were available for purchase at the Levi Jordan historical plantation to [THC] Chairman John Nau III. She addressed the email to him and other commissioners, but did not include him as a direct recipient.

**Update, December 12, 2023:** This story has been updated to clarify Haas's employment and to include more context on the 23 books she emailed the commission about, her thinking on why they might be inappropriate, and her suggestions for replacement titles that could be sold.

**Update, January 27, 2024:** This story has been updated to clarify what Haas says were her intentions in sending a list of books available at the Levi Jordan gift shop to David Gravelle. Haas did not ask for books about slavery, specifically, to be removed from the site, although the list of titles that she flagged to the commission, and that are no longer available for sale at the site, include works about slavery as well as ones about racism.

On June 17, 2024, Haas filed suit against appellants, alleging the article "distorts the facts" and "falsely portrays [her] efforts to engage [THC] regarding the relevancy of books sold in the gift shops of two of [THC]'s historical sites." The petition argued that "[a]ny statement in the article that explicitly states or insinuates that [Haas] objected to books on slavery, asserted that the historical sites focus too much on slavery, or advocated for the removal of any book on slavery is false and defamatory." Haas alleged that the article, "even in its revised state, is libelous" and caused damage to her reputation

and earning capacity, as well as mental anguish.

Appellants filed a motion to dismiss and for sanctions pursuant to the TCPA on September 6, 2024. In the motion, they argued that Haas "has not identified any actionable statements" in the article and that the article was not published with "actual malice." Appellants attached evidence including a declaration by Monacelli, excerpts from *200 Years a Fraud*, and the original and updated versions of the article at issue. Haas filed a response, which included her affidavit and printouts from various websites. Appellants filed a reply. After a hearing on November 20, 2024, the motion to dismiss was denied by operation of law. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.005, .008(a). This interlocutory appeal followed. *See id.* § 51.014(a)(12) (permitting immediate interlocutory appeal of denial of TCPA motion to dismiss).

## II.    DISCUSSION

### A.    TCPA

The TCPA provides a procedural mechanism for the expedited dismissal of a suit which implicates certain constitutional rights. TEX. CIV. PRAC. & REM. CODE ANN. ch. 27. It is intended to "protect[] citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). To obtain dismissal of a legal action under the TCPA, the defendant has the initial burden to demonstrate that the "action is based on or is in response to . . . [its] exercise of: (A) the right of free speech; (B) the right to petition; or (C) the right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1). If the defendant meets this initial burden, then the plaintiff must establish by "clear and specific evidence a prima facie case for each essential element of the claim in question" to avoid dismissal. *Id.*

§ 27.005(c). Even if the plaintiff makes this showing, the trial court must nevertheless dismiss the action if the defendant then "establishes an affirmative defense or other grounds on which the [defendant] is entitled to judgment as a matter of law." *Id.* § 27.005(d).

A "prima facie case" means "evidence that is legally sufficient to establish a claim as factually true if it is not countered." *S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018). It represents the "minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true." *Schimmel v. McGregor*, 438 S.W.3d 847, 855 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). In the context of the TCPA, "clear" has been interpreted to mean "unambiguous," "sure," or "free from doubt," while "specific" has been interpreted to mean "explicit" or "relating to a particular named thing." *In re Lipsky*, 460 S.W.3d at 590.

Our review of a ruling on a TCPA motion to dismiss is de novo. *Entravision Commc'ns Corp. v. Salinas*, 487 S.W.3d 276, 281 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied). We review the evidence in the light most favorable to the plaintiff. *Schimmel*, 438 S.W.3d at 855–56. In determining whether a legal action is "subject to or should be dismissed under" the TCPA, "the court shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a).

## B.    Defamation

The elements of a defamation cause of action are "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with

8

the requisite degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d at 593. "Because of the importance of cultivating and protecting freedom of expression, the plaintiff bears the burden of proving falsity if," as is undisputed here, "the alleged defamatory statements were made by a media defendant over a matter of public concern." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017).

A statement is defamatory if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (defining libel as "defamation expressed in written or other graphic form"); *see Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623–24 (Tex. 2018). A statement does not give rise to liability if it is either "not verifiable as false" or if "the 'entire context in which it was made' discloses that it is merely an opinion masquerading as a fact." *Tatum*, 554 S.W.3d at 624 (quoting *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002)); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 73.005(a) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action."); *In re Lubbock*, 624 S.W.3d 506, 515 (Tex. 2021) (orig. proceeding) ("[T]rue statements cannot form the basis of a defamation complaint.").

The "requisite degree of fault" depends on whether the person allegedly defamed is a private individual or a public figure. *In re Lipsky*, 460 S.W.3d at 593. Where the plaintiff is a public figure, it must be shown that the defendant's statements were made with "actual malice." *Id.* "'Actual malice' in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth." *Id.* It "concerns the defendant's attitude toward the truth, not toward the plaintiff." *Freedom Newspapers of*

9

*Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005); *Huckabee v. Time Warner Ent. Co.*, 19 S.W.3d 413, 420 (Tex. 2000) (noting actual malice does not include "ill-will, spite, or evil motive"). The actual malice element is "relatively demanding" and "honors our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks' on public figures.'" *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

For purposes of defamation law, a plaintiff may be a general-purpose public figure or a limited-purpose public figure. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). "General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts." *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). "Limited-purpose public figures, on the other hand, are only public figures for a limited range of issues surrounding a particular public controversy." *Id.* A defamation plaintiff will be considered a limited-purpose public figure if: (1) the controversy at issue is "public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution"; (2) the plaintiff has "more than a trivial or tangential role in the controversy"; and (3) the alleged defamation is "germane to the plaintiff's participation in the controversy." *Id.* (citing *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987)); *see ZYZY Corp. v. Hernandez*, 345 S.W.3d 452, 459 (Tex. App.—San Antonio 2011, no pet.) ("[T]o be considered a limited-purpose public figure for defamation purposes, one involved in such

10

a public controversy must have more than a tangential role, must seek out publicity, try to influence the outcome of the controversy by publishing his views, or engage in activities that necessarily increase his exposure to injury to his reputation.").

## C.   Analysis

There is no dispute that Haas's claims are "based on" or "in response to" appellants' exercise of the right of free speech[1]; thus, the burden was on Haas to produce "clear and specific evidence" establishing a "prima facie case for each essential element" of her claim, including falsity. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *D Magazine Partners*, 529 S.W.3d at 434. Moreover, Haas concedes she is a "limited-purpose public figure" for purposes of her suit and therefore had the burden to produce clear and specific evidence of actual malice as part of her prima facie case. *See WFAA-TV, Inc.*, 978 S.W.2d at 571.

In her petition, Haas alleged that the subject article's "core defamatory claim" was that she "advocated for removing of slavery books from plantation gift shops." She claimed the article falsely stated that she "objected to" all of the books sold at the Levi Jordan plantation gift shop and that her "demands were met" when those books were removed. Haas further complained about the article's statements that she was "incensed" by the video she saw at the Varner-Hogg plantation and that she believed the video "focused too much on slavery at the site."[2]

---

[1] "Exercise of the right of free speech" means "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). It is undisputed that the subject article meets this definition.

[2] Haas also complained in her petition about the article's statement that she has "spent years critiquing historical narratives about slavery" and its synopsis of her book *200 Years a Fraud*. However, she did not address those statements in her response to the motion to dismiss, and she does not address them on appeal.

11

Appellants argued in their TCPA motion to dismiss, among other things, that the subject statements were not false, that Haas has no evidence of actual malice, and that its evidence affirmatively negates actual malice. They attached an affidavit by Monacelli stating, in relevant part, that he interviewed Haas for two hours on November 14, 2023, prior to publication of the article. An audio recording of the interview was attached to the affidavit.[3]

Monacelli stated that he is not aware of any false statement in the article as originally published. Specifically with respect to the article's statements that Haas was "incensed" by the visitor's center video and that she believed the video "focused too much on slavery," Monacelli asserted this was an "accurate (and at least a rational) interpretation" of Haas's September 2, 2022 email to Gravelle, a copy of which was attached to the affidavit. In the email, Haas advised Gravelle that the video was "[n]ot balanced at all. It is plainly stated [in the video] that the goal is to NOT talk about the museum the Hoggs created and to place the focus on slavery. But that's not the entire story of the site." Haas also complained to Gravelle about a portion of the video in which a commentator "imagines [how] slaves felt"—she opined that "[t]he mention of so many 'feelings' is ridiculous. . . . That contributes jack shit to the historical narrative, which is a factually rich one." Finally, Haas complained in the email about the presence of "Ibram X. Kendi and *White Rage*" at the gift shop, without explaining why that author and work were objectionable.

Monacelli averred that the article "did not state, nor did I intend for it to state, that

---

[3] Appellants' TCPA motion to dismiss also included an affidavit by Benjamin Rowen, the publication's editor, detailing Haas's correspondence to him after publication of the article, which led to the "[c]orrection" and "[u]pdates" set forth above.

Haas advocated for removing *all* slavery books from the historical sites." Instead, based on his review of Haas's emails and YouTube videos, he believed she "advocated for removing" "several" books concerning "racism and slavery"—such as *White Rage* and *Stamped From the Beginning*—all of which were included in the list of twenty-three titles she emailed to THC commissioners.

A copy of that email, dated April 19, 2023, was attached to Monacelli's affidavit. In it, Haas stated that the gift shops at both historical sites were "full of modern, highly politicized books" and that the shop at the Levi Jordan plantation in particular "has increased its fiction and radical black feminism/memoir sections threefold." She invited the commissioners to "assess for yourselves how relevant [the twenty-three books] are to the history of Brazoria County," and she posed the following rhetorical questions:

> Why is the State of Texas selling an afro-vegan cookbook at a state historic site? Or fiction about people living in Chicago in the 1890s? What do books written and edited by Ibram X. Kendi have to do with the Varners, Pattons or Hoggs? Do the sale of such books and the promulgation of skewed site interpretation represent Texas well? What policies may be implemented to prevent us from the embarrassment of presenting activism instead of history faithful to the historical record at our cherished sites?

In her response to the motion to dismiss, on the issue of actual malice, Haas principally pointed to the audio recording of Monacelli's pre-publication interview with her. Haas told Monacelli in the interview that she did not intend for all of the books on the list to be removed but rather intended for the THC to evaluate each of them individually. Instead, she told him that "the most important thing that ever happened [at these sites] was slavery" and that at least one of the books which was on the list—*Remembering the Days of Sorrow*, "an edited selection of Texas WPA slave narratives"—was indeed "representative of the history of that site" and "should be there" at the gift shop. Haas also attached her own affidavit, stating in relevant part:

13

2.      ["]On Wednesday April 19, 2023, I sent an email to the [THC] by and through its Executive Assistant, Paige Neumann, and attached a document titled "Books for sale in the Levi Jordan gift sh[o]p as of April 02, 2023" (the "List"). The email and accompanying List are attached to Defendants' Motion to Dismiss as Exhibit A-2.

3.      ["]The List includes all of the books I believed were available for sale at the Levi Jordan Plantation gift shop on the date reflected on the List—April 2, 2023. The books on display at the Levi Jordan Plantation gift shop on April 2, 2023 were photographed on that day by my business associate at the time, Mark Pusateri. If other books not included in the photographs were located at the Levi Jordan Plantation on April 2, 2023, they were not visible to the public at the time the photographs were taken."

We cannot conclude that Haas's affidavit or the unsworn representations she made in her pre-publication interview with Monacelli constitute "clear and specific" evidence that the subject statements were false, that appellants knew about their falsity, or that they were reckless about their truth. First, Haas did not actually deny in her affidavit that she "objected to" all twenty-three books on the list she sent to THC, nor did she deny that she "advocated" for their removal. Further, she did not deny in her affidavit that she was "incensed" or "[o]utraged" by the visitor's center video she viewed. More broadly, she did not deny the truth of what she claims is the "core defamatory claim" against her in the article—i.e., that she "advocated for removing of slavery books from plantation gift shops."

Second, Haas is correct that the interview recording demonstrates that, prior to publication, Monacelli was aware that she was taking the position that she did not intend for all twenty-three books on her list to be removed. However, at the same time, Monacelli was also aware of Haas's September 2022 and April 2023 emails, both of which indicate that her opposition to the material at the historic sites was broad-based; that it encompassed books related to slavery and the experiences of Texas slaves; and that it was motivated by a desire to "represent Texas well" and avoid "embarrassment." For

14

instance, in her email to Gravelle, Haas complained that the visitor's center video was "[n]ot balanced" in part because it "place[d] the focus on slavery" and speculated as to the "feelings" of slaves at the plantation. She also vehemently objected to the presence of two specific books based solely on the name of the author and the title.

Haas averred in her affidavit that the list she sent to THC commissioners was simply a catalog of all books "visible to the public" at the Levi Jordan plantation gift shop as of April 2, 2023. But there is no evidence demonstrating that Monacelli subjectively knew or believed that at the time of publication. Instead, according to the article, Monacelli obtained an "internal [THC] spreadsheet" indicating that there were eighty-seven titles available at the two sites as of June 2023, and 39 available as of November 2023. Moreover, Monacelli was aware that Haas's organization, Texas History Trust, had explicitly taken credit for the removal of "politically charged books" from the gift shops in an email to supporters. In any event, there is no dispute that the article accurately set forth the representations Haas made to Monacelli in her interview.

In light of all the information available to him, Monacelli could have reasonably discerned that Haas intended for all twenty-three books on her list to be removed, including the ones on the topic of slavery, despite her protestations to the contrary. Even assuming Monacelli was mistaken in that regard, Haas has not met her "relatively demanding" burden to produce clear and specific evidence of actual malice. *See Freedom Newspapers*, 168 S.W.3d at 855 ("An understandable misinterpretation of ambiguous facts does not show actual malice."); *Forbes Inc.*, 124 S.W.3d at 171; *Bentley*, 94 S.W.3d at 594 ("[A]ctual malice cannot be based on a misinterpretation of ambiguous facts that is not unreasonably erroneous."); *see also St. Amant v. Thompson*, 390 U.S. 727, 732

15

(1968) ("Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones."). The evidence, viewed in the light most favorable to Haas, does not establish that Monacelli actually harbored significant doubt about the truth of the challenged statements. *See Bentley*, 94 S.W.3d at 596 ("[T]he actual malice standard requires that a defendant have, subjectively, significant doubt about the truth of his statements at the time they are made.").

For the foregoing reasons, the trial court erred in denying appellants' TCPA motion to dismiss. We sustain appellants' sole issue on appeal.

### III.   CONCLUSION

The trial court's judgment is reversed. We remand the cause to the trial court with instructions to (1) grant appellants' TCPA motion to dismiss, (2) award court costs and reasonable attorney's fees to appellants in accordance with the statute, (3) consider whether to assess sanctions against Haas in accordance with the statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a).

YSMAEL D. FONSECA
Justice

Delivered and filed on the
16th day of October, 2025.